Syllabus.

PETER MATHISON *v.* STATE OF MISSISSIPPI.

[40 South. Rep., 801.]

1. CRIMINAL LAW. *Homicide. Evidence.*

Where, in a prosecution for murder, a witness for the state testified that she recognized defendant by the flash of his gun at the time of the killing, he being fifty feet distant from her, it was error to exclude testimony that such witness was very nearsighted and could not see more than ten feet away.

2. SAME. *Concealment. Purpose.*

Where, in a prosecution for murder, it appeared that defendant's infant son, whose custody had been awarded to him, had been kidnaped by his divorced wife, who had the child living with her on the houseboat where the killing occurred, it was error to exclude testimony to the effect that the defendant hid in a blind about fifty feet from the houseboat for the purpose of taking possession of his child, and not for the purpose of killing the deceased.

3. SAME. *Instructions. Punishment.*

In giving instructions in a capital case touching the power of the jury over the punishment to be imposed in case of conviction, the court should be careful to leave the jury to determine for itself, without intimation from the court, what the punishment should be.

4. SAME. *Self-defense. Instruction.*

Where deceased was not disabled by the first shot, and the second, according to the defendant's testimony, was fired when the deceased was in the act of reaching for a gun which had been dropped from the hands of another, defendant having made no effort to shoot deceased the second time until he reached for the gun, it was error for the court to refuse an instruction to the effect that, if there was a reasonable doubt as to whether deceased was killed by the first shot, the jury should acquit defendant, unless they found beyond a reasonable doubt arising from the evidence that the shot which killed deceased was fired by the defendant when he was not in either real or apparent danger of death or great bodily harm at the hands of deceased.

FROM the circuit court of Adams county.

HON. MOYSE H. WILKINSON, Judge.

Mathison, the appellant, was indicted and tried for and convicted of murder, and appealed to the supreme court.

The appellant married Dinah Pruette, daughter of Sue Pruette, chief witness for the state in this case. The couple separated, as detailed in the opinion, and the homicide under consideration is the result of an effort on the part of the appellant to obtain possession of a child born of the union. On the trial, appellant attempted to explain his presence in the blind constructed by himself near the houseboat in which deceased, Bidwell, and Sue Pruette lived, giving as his reason that he was waiting for an opportunity to get the child; but the court below refused to permit this explanation to go to the jury. The appellant also offered to show that Sue Pruette, who testified as to the details of the homicide, and that she recognized the appellant a distance of fifty feet, and noted his actions, was very nearsighted —in fact, could not see ten feet from her. The court refused to permit this proof to be made. Other facts are stated in the opinion of the court.

*W. C. Martin,* and *G. Benoist Shields,* for appellant.

The facts are as follows: Peter Mathison, appellant, a middle-aged man, married Dinah Pruette, daughter of Sue Pruette, the chief witness for the state in this case. Of this union there was born one child, a little boy, who was about five years of age at the time of the tragedy whence sprang this prosecution. Some two years after the birth of this child, appellant and his wife separated. In the summer of the year 1904 appellant obtained possession of the person of the child from its mother by a *habeas corpus* proceeding, instituted in Warren county, Mississippi, before Hon. George Anderson, then judge of the circuit-court district including that county. The record of that proceeding discloses the fact that the father sought and obtained the custody of the child because of the evil character of

---

* This brief is published in full by order of the court.

the mother, who had then become a common prostitute and an inmate of a house of ill fame.    Having recovered the boy, appellant kept him for a short time in Louisiana, and then, for safe-keeping, placed him with two friends, Mr. and Mrs. W. C. Chaney, who lived near Natchez.    There the child remained, being properly cared for, until a few days before the killing of Bidwell, when Mrs. Sue Pruette, without the knowledge or con-sent of appellant, appeared at the house at which the Chaneys lived and practically kidnaped the little fellow, over the protest of Mrs. Chaney, who was ill, and in bed, at the time.    Sue Pruette was accompanied by Bidwell in this excursion.    The woman, Sue Pruette, was the grandmother of the child, and was evidently an abandoned woman, of the same stripe and character as her daughter Dinah.    Her own testimony shows that she was at this time, and had been for a number of years, living in open adultery with Bidwell.    Having thus fraudulently and forcibly regained possession of the boy, Bidwell and Mrs. Pruette carried him on down to the houseboat on the bank of the Mississippi river in which the pair lived together.    That in thus kidnaping the child they were acting—in part, at least—on behalf and with the connivance of its mother, is apparent, because Dinah Math-ison was at that very time living in one of the huts in the imme-diate vicinity of the Bidwell houseboat.    Discovering that the child had been thus lawlessly spirited away by the very people from whom he had taken it through the intervention of the law, appellant, on the day following the abduction, walked down to the Bidwell abode and demanded the child.    His demand was refused.    He was ordered by Bidwell to stay away from there, and threatened with dire consequences in case he returned for the child.    Still hoping and striving to enforce his rights through the law, appellant applied to the sheriff of the county for advice, and then made an affidavit against Bidwell and Sue Pruette, charging them with stealing his boy.    On preliminary examina-tion the magistrate, Wilmer Shields, discharged the defendants,

and they returned to their habitation in triumph, taking the child with them. Then, in desperation, believing that he had exhausted the law, but determined to rescue his offspring from the abandoned people who had gotten possession of him, appellant went down to the houseboat at daybreak in the morning, armed with a single-barreled shotgun and several shells loaded with B. B. shot. About seven o'clock in the morning appellant killed Bidwell and Jones in manner and under circumstances varyingly related by himself and Sue Pruette. Wresting the child from the frenzied grasp of its grandmother, appellant quietly walked up the hill and on into Natchez. · There he gave his gun to a friend and took the child to a priest's house, where appellant was arrested and whence he was taken to jail. In due time he was indicted and tried for the murder of Bidwell, and found guilty as charged. He was sentenced to death, and prayed an appeal to this court.

Now, with regard to the first two assignments of error, examination of the record will show that there were not many exceptions reserved by appellant to the rulings of the trial judge on the admissibility of testimony. We desire, however, to call the court's attention specifically to the following instances wherein we centend that the court below fell into prejudicial error:

First—In her examination in chief Mrs. Pruette testified that she saw appellant fire upon Bidwell from the so-called "ambush," and that the shot was fired while Bidwell was feeding his chickens. Again, she testified that when the first shot was fired she saw the flash and recognized appellant; that he stuck his whole head and breast out, and looked in every direction; that she was looking right at him. Seaman, a witness for the state, testified that the alleged ambush was, on an air line, at least fifty feet from the houseboat. Now, appellant offered to testify that Mrs. Pruette was very nearsighted—that she could not see at a distance greater than ten feet from her; but, on objection of the district attorney, the court below refused to admit this tes-

timony.   This refusal was erroneous.   Appellant was not giving
his opinion about the matter, but stating a fact.   When Mrs.
Pruette testified that she saw and recognized appellant under
certain conditions of distance, it was entirely competent to con-
tradict her upon the point by testimony that she could not have
seen at that distance, because of her defective vision.   This evi-
dence was not only competent, but it was likewise very material
to the defense of the appellant, even though there is no dispute
as to the identity of the person who shot Bidwell and Jones.
Mrs. Pruette was the only eyewitness of the killing who testified
for the state.   Her evidence made the case one of cold-blooded
assassination.   Any testimony that tended to shake her credit
with the jury and show that she was exaggerating and falsifying
was clearly admissible, and this evidence that she could not see
more than ten feet from her would have flatly contradicted her
statement that she saw and recognized appellant at a distance
shown to be at least fifty feet.   Appellant was surely entitled to
have this evidence go to the jury for what it was worth.   This
court cannot say that the jury would have disregarded it or that
it would not have changed the result.   Right here was the *crux*
of the situation.   It was perfectly apparent that, if the jury
should believe this woman's story, appellant's case was hopeless.
So it devolved upon him, by all legal means available and wher-
ever and whenever it was possible for him to do so, to break down
her testimony—to show the jury that she was not telling the
truth; but the court, in part at least, prevented this being done
by refusing to permit the defense to prove that a portion of her
testimony was of necessity false, thereby cutting off appellant
from the application of the maxim, *"Falsus in uno, falsus in
omnibus."*   That the ruling out of this testimony before the jury
must have been exceedingly harmful to appellant is clear.   By
it the court, as it were, vouched for, and set its judicial seal upon,
the credibility of the main witness for the state, and within the
hearing and under the observation of the jury declined to allow

that credibility to be attacked in a legal manner.   Under such circumstances, what more natural than for the jury to follow the course to which they were invited by the court—to repose confidence in the truth of the testimony of Sue Pruette? We respectfully submit that in this instance the rights of the appellant were disregarded, and that fatal error was thereby committed.

Second—Appellant, testifying in chief, stated that after he had shot Bidwell the first time the latter ran into the room of the houseboat, and that as soon as he (appellant) went in he heard something strike the floor, and he was going on to say that he "suspected that it was the stock of his gun struck the floor," but, on objection of the state, the court below ruled out the portion of his statement about his supicion.   Appellant then testified that he heard him (Bidwell) talking, and Mrs. Pruette "went back there;" that at that time he (appellant) was "up there, hid" —evidently meaning that he was hid in the blind.   On being asked why he was "up there, hid," the court below, on the objection of the state, refused to permit the question to be answered. This rejected testimony was offered for the purpose of throwing light upon the conduct and motives of appellant, and of rebutting any inference of deliberate murder from ambush which the jury might have drawn from the use of the word "hid," if unexplained.   Whatever view the court may take of the act of appellant in firing the first shot at Bidwell, the record shows with perfect certainty that he was not killed by that shot.   The theory of the prosecution was that appellant had been lurking in ambush, intent upon the commission of murder from the start to the finish of the tragedy, and the state undertook to establish the correctness of that theory by the testimony of Sue Pruette.   On the other hand, the theory of the defense was that appellant went down to the houseboat, not to commit murder, but to regain the child; that he concealed himself behind a leafy blind he had constructed, not with the intent to lie in wait and assassinate, but

in order that he might avoid being seen by the inmates of the houseboat while waiting a fitting moment to take the child without being compelled to come in contact with Bidwell or other enemy; that appellant knew, however, that his mission there that morning was an exceedingly dangerous one—that he was verily taking his life in his hands by entering upon those premises at all; that he therefore carried his gun, prepared to defend himself if it should become necessary; that he remained in concealment a long while, waiting a favorable moment to spirit away his little boy; that at last he thought he saw a chance to get the boy away before Bidwell could get back to the boat, and started down the path; that, unfortunately, at that instant Bidwell again appeared, advancing toward the boat, and, as soon as he saw appellant, made a rush for the boat, without uttering a word; that appellant called to Bidwell that he (appellant) had come for his child, and that he (Bidwell) must stop, but that he only made the more speed to the boat; that appellant knew that Bidwell kept a gun on a rack just within the door of the boat, and that, believing that his life was in imminent danger, or would be instantly upon Bidwell's reaching his gun (and the evidence is that Bidwell could not have been over thirty feet, if that far, from the gun when appellant fired), and that the only way to avert peril was to cripple Bidwell, appellant fired upon him; that appellant shot only once, and that Bidwell did not stop, but ran on, showing the agility of a squirrel in jumping on the bow of the boat and running into the room. Now, then, just at this stage of the drama appellant offered to prove that he heard from within the cabin a noise which he believed to be the stock of Bidwell's gun striking the floor, but the court declined to allow him to testify to such belief; yet the belief of appellant as to the then possession of the gun by Bidwell was a most important factor in shaping appellant's course and determining the guilty or innocent character of the course. It must be remembered that appellant at that moment was less than fifty feet from

Bidwell, who was sheltered in his room with, as appellant believed, his gun in his hand.     The parties were too close together for appellant to attempt to get away from the ground by flight without incurring extreme risk of being shot in the back.     He perceived that Bidwell had not been disabled by the shot he had received.     Considering these circumstances, appellant ran back to the blind for protection; and testimony that tended to prove that appellant honestly believed that Bidwell had his gun was perfectly competent by way of explaining an action which without such explanation might wear the garb of guilt.     Such was the theory of the defense, and the appellant was entitled to have it fairly presented to the jury.     He had a right to lay before the jury, not only his acts, but the reasons that prompted him to do these acts.     Without explanation from appellant, the fact of his hiding behind the blind a second time would have been of potent weight against him in the determination of the question whether the subsequent killing of Bidwell was murder or justifiable homicide, and we submit that he had an undoubted right to make that explanation.     15 Am. & Eng. Ency. Law (1st ed.), 942.     "When the motive of a party or a witness in performing a particular act or making a declaration becomes a material issue in a cause *or reflects important light upon such issue* [italics ours], he may be himself sworn in regard to it, notwithstanding the difficulty of furnishing contradictory evidence, and notwithstanding the diminished credit to which his testimony may be entitled as coming from the mouth of an interested witness," citing *Kerrains* v. *People,* 60 N. Y., 221 (19 Am. St. Rep., 158) ; *McKown* v. *Hunter,* 30 N. Y., 625 ; *Seymour* v. *Wilson,* 14 N. Y., 567 ; *Griffin* v. *Marquardt,* 21 N. Y., 121 ; *Forbes* v. *Waller,* 25 N. Y., 430.     We confidently urge upon the court that prejudicial and fatal error was committed against appellant in the rejection of the testimony above specified.

The third assignment of error raises the point that the court

below erred in refusing an instruction asked for the defendant which reads as follows:

"The court instructs, for the defendant, that even though the jury may believe from the evidence that the defendant was not acting in his necessary self-defense at the time he fired the first shot at Bidwell, yet if the evidence has left a reasonable doubt in their minds as to whether Bidwell was killed by this shot or a later one, then they will acquit, unless they further believe from the evidence, beyond a reasonable doubt, that the shot which killed Bidwell was fired by the defendant at a time when he (the defendant) was not in real or apparent danger of death or great bodily harm at the hands of Bidwell."

We understood that the trial judge refused this instruction upon the ground that under the general evidence it did not make any difference which shot killed Bidwell; that, granting that Bidwell was killed by the last, rather than the first, shot fired by appellant, still, the facts and circumstances as presented by the whole evidence were, in his opinion, of such nature as to make the plea of self-defense unavailable to appellant by application of the doctrine that one who, armed with a deadly weapon procured for the purpose, if necessary, of overcoming opposition, provokes a difficulty and slays his adversary, cannot shelter himself behind the plea of self-defense. *Long* v. *State,* 52 Miss., 23; *Helm* v. *State,* 67 Miss., 562 (7 South. Rep., 487); *Prine* v. *State,* 73 Miss., 838 (19 South. Rep., 711). But we submit that the facts of the case at bar do not furnish scope for the play of this principle. The testimony of appellant was that he fired the first shot at Bidwell to stop him and prevent him from reaching his gun, after premising by explaining that he (appellant) had carried a weapon, not with any intention of provoking a difficulty and then using it, but simply to defend himself with it, if attacked; that a considerable interval elapsed after the firing of the first shot before the scene closed (which statement is amply corroborated by the testimony of the women, who had time to

come up to the houseboat before appellant retired); that he himself during that interval, or a large part of it, was up the hill and being fired upon by some one unknown to him, but thought to be a man named Mose Williams, who, so appellant testified on cross-examination, was then sleeping with his (appellant's) wife, and that when he fired the last and fatal shot at Bidwell the latter was in the very act of reaching down for the gun, which had just dropped from the hands of Jones, and that the instant before Jones had had that gun raised to his shoulder and aimed at appellant. Now, surely appellant could not have properly been convicted of the murder of Bidwell upon the firing of the first shot, unless the jury believed from the evidence, beyond a reasonable doubt, that that was the shot which killed him. The first part of the instruction under discussion presents that view to the jury, and it could make no difference as to whether the jury believed that appellant was acting in self-defense or shot without reasonable excuse, manifestly so.

The instruction then goes on to propound the proposition that the jury should acquit unless they are satisfied, beyond a reasonable doubt, that the shot which killed Bidwell was fired by appellant at a time when he (appellant) was not in real or apparent danger of death or great bodily harm at the hands of Bidwell. We are unable to perceive why the court refused this instruction. Certainly, if the jury should believe the testimony of Mrs. Pruette as to the facts of the killing, the instruction could not mislead, to the detriment of the state; for she testified to deliberate, causeless assassination. Again, if the jury should believe the testimony of appellant, or if his evidence should raise in their minds a reasonable doubt as to the truth of Mrs. Pruette's version and the guilt of appellant predicated thereon, then the instruction was in conformity with law and stated a principle of world-wide application; because, in the first place, appellant had negatived the idea that he procured the gun in order to kill Bidwell, and, in the second place, appellant testified that, after

firing the first shot, he made no effort to injure Bidwell until he (appellant) saw the latter in the very act of raising the gun which Jones had dropped—and that, too, under circumstances certain to make him or any other man believe that Bidwell would surely fire upon him, should he ever succeed in getting the gun up.    Thus the instruction is based upon and fits into the evidence of appellant, which does not present such a killing as would shut appellant off from self-defense.   It is true that appellant obtained a gun at Chaney's and carried it with him down to the houseboat; but he says that he took it along because Bidwell had threatened his life if he came down there, and he knew that he was taking chances of losing his life when he went there. He denied that he took the gun with any purpose of provoking a difficulty with Bidwell and then shooting him.    Appellant had a right to go to the premises of these people and recapture from them the little boy they had stolen.    True, it is laid down that the doctrine of right of recaption does not permit one to commit a breach of the peace in its exercise.    But the testimony of appellant was that he was not seeking or intending to commit a breach of the peace; on the contrary, he was anxiously awaiting an opportunity to recover and carry off his child without coming into conflict with any one.    He thought the time had come, and started down the path, when, unfortunately, Bidwell appeared, all too soon for appellant to accomplish his purpose, and by his conduct and manner compelled appellant to act quickly or probably lose his own life.    Upon the evidence of appellant the defense was entitled to this instruction.   The refusal of it was very damaging, for it is exceedingly probable that the jury may have thought that appellant, when he fired the first shot, was not in that imminent peril, at the very instant, upon which the state's instruction laid stress, and may have concluded (and doubtless did do so) that, since no law was given them on the point, the absence of justification for the first shot infected the after shooting and made it murderous, and that thus the defendant was

guilty of murder, though they did not think the first shot was fatal and did not think appellant was acting in self-defense when he fired the last shot.    It seems quite certain, indeed, from the evidence, that Bidwell's death was due to the last shot.    He was not even disabled by the first one.    After receiving it he had strength enough to leap on the bow of the boat and run into the cabin, and some time afterwards to run out on the bow, where he was shot down.    This being so, the error in refusing the instruction becomes clearer and the consequent injury to appellant graver.    Its refusal was tantamount to saying to the jury: "You must convict of murder unless you believe that defendant was acting in self-defense when he fired the first shot, even though you do not believe it was that shot that killed Bidwell."    Under the testimony in this case we submit that this was not the law. *Hunt* v. *State,* 72 Miss., 413 (16 South. Rep., 753).

The fourth assignment challenges the correctness of instructions Nos. 2 and 4 given for the state, when considered together. Instruction No. 2 reads as follows:

"The court instructs the jury, for the state, that if you believe from the evidence in this case, beyond a reasonable doubt, that the defendant willfully, deliberately, and of his own malice aforethought, shot and killed Bidwell at a time when he, the defendant, was not in real or apparent danger of losing his own life or of suffering great bodily harm at the hands of Bidwell, he is guilty as charged, and the jury should so find."

Instruction No. 4 simply tells the jury what kinds of verdict they may render in the case.    Our criticism of these instructions is that No. 2 tells the jury that they should find the defendant guilty as charged if they believe from the evidence that murder has been committed, while No. 4 merely tells the jury that they have the power to find the defendant guilty as charged and fix the punishment at imprisonment for life.    An intelligent jury —and all juries are presumed to be so—seeking conscientiously to do its whole duty, and having solemnly arrived at the con-

clusion that the defendant has committed the crime of murder, takes up the state's instructions and finds the court saying to them: "If you find that murder has been done, you should find the defendant guilty as charged—that is, you ought to find this verdict; your duty requires you to do it. True, you have the power, as told you in instruction No. 4, to return a verdict of 'Guilty as charged,' and to fix the punishment at life imprisonment, but you ought not to render this verdict; you should find simply, 'Guilty as charged.' " Thus the court, while informing the jury of its power in the premises, points out the path of duty and suggests that that path leads away from the exercise of the power. Now, in giving these two instructions for the state, worded as they are, is it not absolutely true that the court, in so many words or by necessary inference, tells the jury that they may give appellant a life sentence if he is guilty of murder, but that they ought to hang him?

We refer the court to the case of *Spain* v. *State,* 59 Miss., 19, in which it was held to be fatal error to charge the jury that they might find the prisoner guilty of murder and fix the punishment at imprisonment for life in the penitentiary, provided the proof warranted. Practically the same error was committed by the verbiage of instructions Nos. 2 and 4 in the case at bar. It is true that in its instructions the court did not say that the finding of the milder verdict must depend upon proof to support it, but it did say that the jury were under duty to bring in the extreme verdict if they believed appellant guilty of murder. It seems clear to us that the principle underlying the ruling in the Spain case upon this point necessarily condemns the two instructions we are considering. As we see it, that principle is that one who is guilty of murder should be found so, but that the jury are to determine for themselves—without hint, intimation, suggestion, or instruction from the court—whether the culprit shall suffer death or be imprisoned for life; that the solution of this question is the province of the jury, in which they are supreme and act

upon their own judgment, without intimation from the court as
to its opinion of what should be done; that every man on trial
for his life is entitled to the exercise of this unbiased judgment
of the jury, unhampered by solemn instructions from the presid-
ing judge; and that whenever this right has been trenched upon
or abridged, reversible error has been committed, as we believe
and urge upon the court was the case here.    We are aware that
in *Penn* v. *State,* 62 Miss., 450, the court held that a defendant
who has not seen fit to have the jury instructed as to their power
to fix the punishment at life imprisonment cannot complain of a
verdict of "Guilty as charged."    But that was an entirely differ-
ent proposition from the one now presented.    Here the state
itself undertook to give the jury the whole law upon the subject,
although it need not have done so, and in presenting the
law, or attempting to do so, couched it in such terms as to point
straight to the gallows.    The error was not cured by any instruc-
tions asked by or given for the defense; but the failure of the
defense to ask for this instruction does not help the matter.
When the state undertook to propound the whole law to the jury,
it took upon itself the burden of doing so correctly, and of not, by
misstatements or unauthorized suggestions, depriving the de-
fendant of any of his legal rights.    In framing its instructions
as it did in this case, the state admonished the jury that they
ought to find a verdict of "Guilty as charged," the consequence
of which, they were further told, would be the hanging of the
defendant.    We conceive that when the state saw fit to give
instruction No. 4 to the jury, in drawing instruction No. 2, in
order to avoid the error we have attempted to point out, it should
have closed the instruction with these words, instead of those
actually used, "He is guilty of murder, and the jury should so
find," leaving for another instruction the presentation of the
two verdicts, either of which the jury could properly find upon a
conviction of murder.    Where, in the trial of a criminal case,
the court, in instructions given for the state, commits an error

prejudicial to the accused, and he is convicted, the judgment must be reversed on appeal, unless it clearly appears that such error was corrected and cured by instructions for the accused. *Hawthorne* v. *State,* 58 Miss., 778.    The error complained of here was not cured.

The overruling of the motion for a new trial presents the fifth assignment of error.    Several of the questions raised by this motion have been already argued under previous assignments, and will not be further referred to; but under it we shall first consider the correctness of the court's ruling in the light of the attack made upon the juror S. H. West and his impartiality as a juror.    The affidavits, as well as the testimony taken before the court on the hearing of the motion, will be found in the record.    It appears to us that the affidavit and testimony of Florence Mack, backed up as it was by a strongly corroborative circumstance that was brought out in the cross-examination of juror West, ought to have gone a long way toward satisfying the court that West was not an impartial man, but had both formed and expressed an opinion hostile to the defendant before he sat upon the jury.    Mack's affidavit and testimony was, substantially, that in a conversation that took place between himself, West, and one J. M. Metcalfe, two or three days before the calling of the Mathison case for trial, Metcalfe expressed himself as being of the opinion that appellant ought to be hanged, whereupon West, in immediate sequence to said remark, said that "Mathison would be all right if it was not for the blind;" that he (Mack) understood West as expressing thereby an opinion that appellant was guilty of murder.    When West, in opposition to the motion for a new trial, was examined by the state, on cross-examination he admitted that he alone of all the jury had, while the trial was proceeding, asked questions about the blind made by appellant, the existence of which blind was one of the most important features of the case.    Does not the fact that West asked such questions powerfully corroborate Mack?    Does it

not show that the mind of West was still running upon that blind as a circumstance showing the guilt of appellant; that he was still considering it as an evidence of a lying in wait for the purpose of assassination? We imagine that the average mind, not pausing to toy with legal niceties, would at once answer such questions in the affirmative, and would rest with great confidence upon the correctness of its conclusions. If West was in that way of thinking when he went upon the Mathison jury, appellant did not have a fair trial before an impartial jury. In presenting this ground for a new trial, appellant brought himself squarely within the rule on that subject laid down in *Brown* v. *State,* 60 Miss., 447. Now, when the motion for a new trial was heard, the state, in opposition to the affidavits of appellant, his counsel, and Mack, introduced the juror West and the witness Metcalfe. West simply denied that he had said anything about a blind or expressed any opinion whatever in the conversation referred to in the Mack affidavit. Metcalfe said that he left Mack and West talking together; that he did not hear West express any opinion as to the guilt or innocence of appellant, and did not hear him say anything about a blind. On cross-examination Metcalfe said that the parties involved had not been talking about the Mathison case at all; that they were discussing the Womack case and some other case that occurred in another county, and that no mention was made of the Mathison case. Now, it is apparent from the testimony of both Mack and West that the Mathison case was mentioned in that conversation, so that Metcalfe was manifestly mistaken when he testified to the contrary; and as he said that he left the other two together, his evidence amounts practically to nothing. We have left Mack's oath against West's, with Mack's testimony corroborated by West's action on the trial. From this evidence, might not the court with entire propriety have found that West did make the remark attributed to him, and did make it under the circumstances detailed by Mack? We think so. The question being

thus presented to the court on these affidavits and this testimony, the trial judge overruled the motion, without stating whether he believed or disbelieved that juror West had made the statement attributed to him by Mack and without indicating whether, as to that ground, the motion was overruled because, in his opinion, the language said to have been used by the juror did not fairly import that the latter had formed an opinion against appellant, or because he did not believe that the juror had used the language at all. We submit that this failure of the court to indicate the ground upon which it was proceeding, and to squarely decide the issue of fact presented to it, entitles appellant to a new trial. The case of *Sam* v. *State,* 31 Miss., 481, is directly in point upon this proposition. There was a reversal in that case, this court holding that, when the trial judge overruled the motion for a new trial, without indicating his belief or disbelief in the truth of the affidavits by which it was supported, those affidavits must be considered and taken and treated as placing the juror in the same attitude in which he would have stood if he had stated the facts deposed to in open court, when brought forward as a juror and examined touching his fitness to sit on the trial of the prisoner. Does this court believe for a moment that appellant would have permitted West to sit on the jury, had he known that, only three days before the trial, while talking with two other persons about the Mathison case, the latter had said that "Mathison would be all right if it was not for the blind," and that he had made that remark immediately after his interlocutor had expressed the decided opinion that appellant ought to be hanged? Does the court not see, from the evidence afterwards introduced on the trial, what an important figure this blind cut—how the state used its creation by the defendant as proof of a murderous purpose? Does not the record cast back upon this remark of West—in itself, without the key to its meaning, apparently innocent and nothing threatening to appellant—a most deadly significance? And does not

that significance shine out when he asks about the blind while
witness is testifying? Never would he have been permitted to
sit on that jury, had appellant or his counsel had the least inti-
mation that he had made this comment, and that within three
days before the case was tried. In all earnestness we say that
it seems to us childish to contend, in the light of this record, that
West's allusion to the blind was not tantamount to, and intended
by him to mean, the expression of a belief that appellant was
guilty of murder. Mack so understood it when the remark was
made. After the trial the district attorney evidently thought
that such was the proper interpretation to put upon it, for he took
issue and endeavored to prove that West had never made the
remark. And we think that this court will so understand it;
for, if that remark did not mean that West thought appellant a
guilty man, what in the name of Heaven did it mean? Indeed,
the remark indicates a settled opinion, arrived at after careful
consideration of the facts and circumstances of the case. Does
not this court know that all the citizens of Natchez had heard
about this case? Its very bizarre and unusual features insured
its being a nine-days' wonder, and West had concluded that
"Mathison would be all right if it was not for the blind." That
meant that, with the blind considered, "Mathison was all wrong,"
and that Metcalfe was right in thinking that appellant ought to
be hanged. It seems to us idle for any man to come forward
and insist that he has not formed or expressed an opinion as to
the guilt or innocence of a person charged with murder, after
making such a remark as West made about appellant. We were
entitled to an impartial jury; without fault or lack of diligence
on our part, we failed to get it. A man crept upon the jury who
ought not to have been there. We respectfully urge this court
to right the wrong. We do not find that the doctrine laid down
in *Sam* v. *State, supra,* has ever been overthrown in this state.
It is recognized and enforced in *Cannon* v. *State,* 57 Miss., 147,
where it is said that if there had appeared in the record any evi-

dence that the judge disbelieved the charge made against the juror the judgment would be affirmed.　See the closing paragraph of the opinion in the case.

We will now proceed to a brief consideration of the evidence in this case upon the point raised in the motion for a new trial— that the verdict was contrary to the law and the evidence.　. We do this with diffidence and some degree of hesitancy, fully recognizing the stringent rule adopted and enforced by this court in upholding verdicts where there is evidence to support them. But while we may fail in convincing the court that this verdict and judgment should be set aside as unsupported by the evidence, we feel confident that we will by this course succeed in satisfying . this court that the judgment appealed from should not stand regardless of such errors as the court below may have fallen into. The argument of the state may be that the whole evidence, including that of the appellant himself, presents a clear picture of murder, and that, therefore, the appellant was not prejudiced by any errors committed against him during the progress of his trial.　This argument, it is true, could not apply to or affect the point we have made—that the court erred in telling the jury that they should hang appellant; because, however black and. hideous a murder may be, it. is the jury's prerogative to say whether the criminal shall suffer death.　But such argument would, if it prevailed with the court in passing upon this appeal, have the effect of disposing of the other errors of which we have complained as immaterial.

We have, then, a picture either of foul assassination, with accompaniments of great brutality, or of the execution of a high and lofty purpose, inspired by one of the purest and noblest sentiments of the human heart, parental love—a love that was fixed on the purpose of rescuing, even in the face of death, its object from contamination and corruption.　This man, after his head had been silvered over by the snows of nearly half a century, found himself the father of a little boy, whose mother, sprung

from a corrupt stock, had lapsed from the path of virtue and sunk to the depths of public prostitution. The child's grandmother, Sue Pruette, was a woman of no better character, habits, or morals, than its mother. . For three years appellant permitted the baby to remain with its mother and grandmother. He had no permanent home of his own to which to take the child, and then in its innocent infancy it could receive no hurtful stain from the vicious habits and example of the depraved people by whom it was surrounded. But as time went on, the child was growing old enough to understand—or, if not to understand, to imitate—the vile language and loose conduct of those who should have been its natural protectors. The father saw and realized and recognized the duty he owed his offspring, and, under the process of the circuit court of Warren county, in *habeas corpus* proceedings against its mother, assumed the possession and custody of his boy. When the writ of *habeas corpus* was tried, Sue Pruette was in Vicksburg, aiding and abetting her daughter in her efforts to retain possession of the baby. That she was so doing stamps her for the person that she is. This court might shrewdly infer the nature of the defense that was probably attempted to be interposed against the claim of an outraged husband to the custody of his child—a denial of its paternity. Read the testimony of the Pruette woman, wherein, on cross-examination, she more than intimated that this child was the child of her daughter Dinah, but not of that daughter's husband, Peter Mathison. Look at the testimony of Ida May Raussin, granddaughter of Sue Pruette—who does not know her own age, but who cannot be over sixteen years old—where she also throws a doubt upon the parentage of this poor child, and says that she does not know whether the child is appellant's or not; that "they" call it so. It would seem that branding this unfortunate little fellow as a spurious issue was a habit of this family. How utterly bad and vile these people were appears from this evidence. Bastardizing, or attempting to do so, a poor little crea-

ture who had been born in wedlock, and whose sole inheritance now seems to be that he is legitimate, and manifestly inflicting this crowning wrong upon him to prevent his father from taking him away from ignoble and criminal surroundings to an atmosphere where he might grow to the stature of a good man and citizen! When this court sees and appreciates the full extent of the abominable crime that was being perpetrated against a little child by its own blood kin, can it not find in the conduct of appellant at least a suggestion of a lonely man sacrificing himself for his child?

But appellant is awarded the custody of his little son by Judge Anderson, and appellant takes the child away with him, first to Louisiana, and then, as appellant was a machinist, with no fixed place of abode, and as the boy, on account of his tender years, needed the care and attention of a woman, appellant intrusted him to two friends, Mr. and Mrs. W. C. Chaney, who were living in or near the suburbs of Natchez. Suspecting that the boy's mother and grandmother would in all likelihood make some further effort to regain possession of him, appellant straitly charged Mrs. Chaney not, under any circumstances, to let these people have the boy or take him away from her. But his precaution was in vain. Sue Pruette and her paramour—the dead man, Bidwell—seized an opportunity, when Mrs. Chaney was lying sick, in bed, and her husband away in the fields, to kidnap the boy and carry him back to that settlement, on the banks of the Mississippi, which was reeking with vice. Appellant hears of his loss, and, while his heart was doubtless sore and hot within him at the thought of the outrage that had been perpetrated, does he attempt any act of retaliation or of violence? No; on the contrary, he proved himself to be a law-abiding man—one who, in the face of the deepest injury that can be inflicted (save one), was not driven to right his wrongs by instant personal violence, but was willing that his rights might be vindicated by the law of the land. He went down to the houseboat and demanded

his child from its abductors. He was met with refusal, insult, and threats from Bidwell; he was defied by the wrongdoers. What would the average man have done under such circum¹ stances, when insult was added to injury? That appellant or Bidwell did not die on that occasion is proof positive that appellant is a peaceable, law-abiding man; for the injury that was then being wrought upon him and his was of the kind that makes men go mad and see a vision of blood. Appellant made no attempt to retake his child by force; on the contrary, he went straight to the sheriff of the county for advice and help. Appellant wanted to do the right thing. He did not consult a lawyer as to his further rights; perhaps he had no money to employ an attorney (he has been defended in this prosecution by counsel appointed by the circuit court). But, at all events, he showed his good faith by resorting to the fountain head of the administration of law in his county. Then, acting upon what the sheriff told him, he went before a justice of the peace and made an affidavit against these child stealers, charging them with statutory offense. 'Tis pity that this justice of the peace, Shields, who investigated the charge, could not, or did not, see his way clear to bind the defendants over. Had he done so, in all human probability Bidwell and Jones would be living men today, and appellant would not be resting in the shadow of the gallows. But it was to be so. Shields turned the malefactors loose. Perhaps the legal evidence that appellant had been awarded the child was not before the justice of the peace, and perhaps the child's mother swore that she had given these defendants permission to go and get the boy. These matters were not in issue and could not appear in this record. But Bidwell and Sue Pruette left the magistrate's office in triumph, carrying appellant's son with them and defying appellant to get the boy from them. And now appellant makes up his mind to exercise a natural, a God-given, right. The law had failed him. He would go down and steal his own child, and remove it far from

the influence of those who had shown such determination that it should not escape them and their pestilential association. But he knew that there was pronounced danger to himself in carrying out this enterprise. The feeling between himself and Bidwell was bad. How could it have been otherwise? Bidwell had threatened that, if appellant came down after the child, he would kill him. So appellant armed himself with his single-barreled gun, and made himself a blind, or screen, by the side of the path, about fifty feet from and above Bidwell's houseboat. This was one of the paths that led down from the brow of the bluffs to the flats. Before taking his stand at this place—which he did about daybreak in the morning—appellant satisfied himself as to the whereabouts of the boy. He heard the child talking in the night in the houseboat. As soon as he was certain about this point, he constructed the screen and there awaited an opportunity to steal out and carry the child away. He remained there until the sun had climbed high in the heavens; and all the while every chance was given him to shoot Bidwell down, had murder been his purpose. Long before the *denouement* arrived, he had seen Bidwell coming and going within easy range of his gun. But appellant waited for the time to come when Bidwell would separate from the child and leave the houseboat. Believing at length that the opportunity had arrived when he would be able to snatch up his child and retreat in safety, appellant stepped into the path and down for a few paces toward his child, who was then playing about in front of the house.

Just at this point—or, in fact, immediately before it in time—Sue Pruette and appellant, the only living eyewitnesses (except the child) of the tragedy that ensued, come into sharp and irreconcilable conflict. "Foul, horrible murder from ambush!" she says. "Shooting in self-defense," is his reply. The more we study this record, the more difficult it is for us to understand how the jury could have accepted this woman's story as true, as they must have done to find the verdict they did.

Her testimony is a tissue of falsehood from beginning to end—
contradicted by inherent probabilities; contradicted by physical
signs about the place; contradicted, and vitally so, by the testi-
mony of the other witness for the state—and marked by excess-
ive malignity toward appellant.    Sue Pruette swore that, after
appellant had shot down Bidwell and Jones in cold blood, he
came aboard the houseboat, took Bidwell's gun from its rack,
and laid it beside the dead bodies of his victims, making a case
of self-defense for himself.    That this statement is a falsehood
is proved by the testimony of her own daughter, Mrs. Stephen
Jones, for Mrs. Jones says that when she came to the scene of
the killing, and stepped up on the bow of the boat and looked at
the bodies of her husband and Bidwell, Bidwell's gun was then
lying beside the bodies; that she left the boat, and afterwards
she saw appellant, with his gun in his hand, come down the path
and enter the boat; heard him having some talk with Mrs.
Pruette—exactly what, the witness could not say; and then
saw him reappear, with his gun in hand and with his child on his
arm, and leave the boat and depart; and that during all this time
the gun that Bidwell owned was lying by the bodies on the bow
of the boat.    Not satisfied with being the direct cause of the
death of two men, this woman seeks the life of a third in per-
jured testimony.    If Mrs. Jones spoke the truth—and can the
court doubt it, when it remembers that the man Jones, who was
killed by appellant, was her husband?—then appellant was
telling the truth when he told of the manner in which that gun
was used by Jones and Bidwell and of the circumstances under
which it came to be where it was found.    If appellant was telling
the truth in these particulars, he was not guilty of murder.    Sue
Pruette testified that appellant, with a revolting brutality,
dragged her and the child out onto the ground, there tried to kill
her by knocking her in the head with his gun, and, supposing
he had succeeded, wrested the child from her grasp and left her
strangling with blood.    That all of this is false is proved by

the testimony of both Mrs. Jones and the girl, Ida May Raussin. They both testify that appellant got the child away from Sue Pruette within the houseboat and went straight away afterwards. That he did strike the woman over the head with his gun barrel he says himself, but he did so to force her to let go the baby. Had he wished to kill her, as she says, to leave no witness of his crime, he could easily have shot her also. The blow that he gave her evidently amounted to nothing. While the wound she received bled some, her daughter testifies that her mother was not knocked senseless, and the witness Peale says that it was only a scalp wound. Sue Pruette actually tried to deny that there was any child in the houseboat at all that morning; the fact of its presence there was dragged out of her on cross-examination. The malignant motive of the woman in attempting this concealment is patent. She knew perfectly well why appellant was down there that morning: that he had come for his child, and for that only. But she did not wish the jury to know anything about the child; she wanted them to believe that the man was there to murder Bidwell, and for no other purpose. Her evasions and denials on this point alone, as it seems to us, ought to have discredited her entire testimony. If there was anything needed to support the evidence of Mrs. Jones that Bidwell or Jones carried Bidwell's gun out on the bow of the boat, it is supplied by Peale's evidence—and he a deputy sheriff of the county. He testifies that blood marks were found immediately beneath the gun rack in Bidwell's room. These marks came there from Bidwell, who had been wounded by appellant's first shot.

Does the court believe the story of this woman, when she says that after Bidwell had been grievously wounded he made no movement to get his own gun, then within easy reach of him, when he was not disabled, and had the strength, according to her own story, to walk out on the bow from the cabin? The conduct of appellant after the shooting gives the lie to Sue

Pruette. If her testimony was true, then this man must have been lurking in ambush for hours with murder in his heart—must have thought out his plans and carefully prepared to execute them. Any man who was proposing to himself an assassination from ambush, with plenty of time to mature his villainous scheme, would most assuredly have made some preparation to make his escape after the deed was done. Was there ever a case in which an ambushed murderer had made, or attempted to make, no arrangement to get away and avoid the consequences of his crime? Appellant certainly made no advance preparation for his escape, nor did he flee after he left the houseboat with two dead men piled on the bow. His conduct was that of a man who was conscious of no wrongdoing. He walked calmly back up the railroad, carrying his child with him, and so on into the city of Natchez, in broad, open day, knowing that the hue and cry would be raised against him within a few minutes, yet making no effort to get away, but walking straight to the house of the priest, there to be arrested and to follow the officers unresistingly to jail. Was this the conduct of a common assassin? We confidently assert that a close perusal and analysis of this record will convince the court that the appellant in his testimony told a plain, straightforward tale, that in all essential particulars was absolutely true. In all those details in which Sue Pruette is contradicted, appellant is corroborated. He says he shot Jones just as the latter was sighting along his gun, which was pointed at appellant. Peale proves that the gun, with its muzzle pointed toward the blind, was lying by the body of Jones. Mrs. Jones says that the gun was there before appellant boarded the boat. That being so, Bidwell's gun must have been in the hands of one or both of the men killed by appellant that morning. That conclusion is inescapable. This being true, you have just the affray to which appellant has testified. You have a man placed in a position whence to have run would have subjected him to deadly peril. Had he no right to fire in self-

defense when he saw Jones taking aim at him? Had he no right to fire when he saw Bidwell reaching down for the gun which Jones had not been quick enough to discharge? But we confidently submit that appellant's first shot was justified. He rationally believed himself in imminent danger. Was he not? Bidwell had threatened to kill him. Bidwell was rushing for his room, and for the gun which lay in its rack just within the door. The distance to be traversed by Bidwell in order to reach the gun was trifling; it would have taken an active man not a moment to get possession of his weapon, and the evidence shows that Bidwell was an active man, notwithstanding his sixty-five years. He was shot, and yet sprang upon the boat and made his way within the cabin with the agility of a squirrel. Had Bidwell been at all decrepit, the state would have proved it in rebuttal of appellant's testimony. Bidwell had only about thirty feet to traverse, and he was under the influence of the strongest excitement. What was appellant to do in this emergency? Nothing on earth but what he did do, what he had a right to do, what any other man in the world would have done. Any attempt to run would have been futile. He could not have gotten away and out of gunshot before Bidwell would have been in possession of his gun. To have remained where he was—considering the relations of the men, the threats, the determined rush of Bidwell in face of the order to halt and the sight of appellant's gun, and the knowledge possessed by appellant that Bidwell kept his gun in that rack—would have been the act of a madman. Appellant was compelled to shoot.

This record displays the tragedy of a loving father driven to do men to death in the assertion of his rights, the performance of his sacred duty to his child, and the defense of his own person. If this drama shall close with the execution of appellant, he will have completed the sacrifice made for his boy and sealed it with his lifeblood.

*R. V. Fletcher,* assistant attorney-general, for appellee.

The first assignment of error attacks the ruling of the court in sustaining an objection to the testimony of defendant as to how far Mrs. Pruette could see.    It will be observed that the court permitted the witness to state that Mrs. Pruette was nearsighted, but refused to allow to go to the jury any testimony as to how far she could see.    This was bound to have been a mere opinion of the witness, and the refusal of the court to let it go to the jury could not be reversible error.    At the time the objection was sustained, it was not shown that the witness was purporting to speak of his own knowledge.    The court permitted him to state that she was nearsighted, and probably the "ten-foot" statement would have been permitted had counsel shown that the witness knew this to be true.    The question was not repeated after appellant testified that he knew she was nearsighted.

The court sustained an objection to a question as to why appellant was in ambush at a certain, particular stage in the difficulty. It will be seen that the court permitted the witness to state all the facts—any and all of them—but very properly declined to permit him to state what his suspicions were or what conclusions he drew from them.    It is for the jury to say, in the light of the proven facts, whether appellant as a reasonable man acted under a conscientious and reasonable belief of impending danger.    The exclusion of this solitary question could have worked no harm to appellant, nor could it be reasonably said that any harm resulted.

The instruction touching the first and second shots was properly refused under the facts in the instant case.    The instruction means that a defendant can, without any sort of excuse or justification, make an assault and dangerously wound his antagonist, and then in the same difficulty kill him by a later shot if perchance his adversary after the first shot makes an effort to defend himself.    It must be remembered that the witness Sue Pruette testifies that the second shot was fired almost immediately after

the first one, and that after the second shot Bidwell died.    It is not the law that one may waylay his enemy, cripple him with a shotgun, and then kill him if between the first and second shots he makes any effort to save himself.    The law of self-defense has no application.    In their able argument appellant's counsel lose sight of the fact that this was a continuous difficulty, provoked by appellant, and that he made the assault, as he himself admits, at a time when his unarmed adversary was seeking safety in flight.    According to appellant, when he fired the second shot he had taken refuge in his hiding place, with his gun trained upon his enemies.    Under these circumstances, it would be strange, indeed, if appellant could be heard to say that when he fired the second shot he had reason to fear some bodily harm at the hands of the deceased.

Counsel complain of instructions given for the state, when taken together, on the ground that the jury might have been misled as to the punishment in case there was a verdict of "Guilty as charged."    But this contention is overrefined and presents no just ground for complaint.

WHITFIELD, C. J., delivered the opinion of the court.

It was error to exclude the testimony of the appellant that Sue Pruette was very nearsighted—could not see more than ten feet from her.    This testimony was vital.    According to the testimony of Sue Pruette, the killing of both Jones and Bidwell was simply assassination.    She testifies evidently with great animosity toward the appellant.    It was distinctly shown that the blind behind which appellant hid himself was fifty feet from the houseboat on which Sue Pruette was at the time she swears she saw appellant shoot Bidwell.    She says she recognized appellant by the flash of the gun, and that she has never seen as well as she saw that morning.    If it were true, as stated as a fact by the appellant—and of this the jury were the exclusive judges—that she could not see ten feet from her, it is obvious that she

could not have seen the appellant fifty feet away.    It seems probable that the court excluded this statement, esteeming it to be the statement of an opinion; but this is not correct.    It is made as the plain statement of a fact within the knowledge of the appellant, the son-in-law of Sue Pruette, who had lived with her for several years and had had every opportunity to know the fact.

It was also vital error to exclude from the jury the testimony of the appellant as to why he was hid in the blind.    His statement is that he went there for the purpose of getting his little son from these people, who are shown beyond all controversy to be utterly unfit for his custody, as had been decided by the *habeas corpus* proceedings in which the custody of the son had been awarded to the father against the mother, because of her licentious life and conduct.    The testimony shows that after the court had awarded the custody of the little boy—about five years of age at the time of the trial of this cause—to the father, for the reason stated, the father took the son with him to Louisiana, where he went to work; that, finding it inconvenient to have his son traveling around with him, as he went from place to place working, he left him with Mr. and Mrs. Chaney, in Natchez, with a strict charge never to let these people have him; that, nevertheless, on May 10, 1905, when Mr. Chaney was working in the field and Mrs. Chaney was sick, the woman, Sue Pruette, and her paramour, Bidwell, abducted the child from the house of Mr. Chaney and took it aboard the houseboat moored near the river bank; that appellant, desiring to observe the law, went down and demanded the possession of his child, but was driven off, with threats of injury should he ever return; that he then, still desiring to follow the law, went to the sheriff of the county and asked him to take action for him, and, under the advice of the sheriff, had Sue Pruette and Bidwell arrested on the charge of stealing his child; that, unfortunately, the justice of the peace discharged these parties; that then, driven to desperation

by the abduction of his child, who had been by the law awarded
to his custody, and by the threat of injury if he attempted to
again take possession of him, and by the unfortunate termina-
tion of the trial in the magistrate's court, the appellant had con-
structed this blind—the chief thing against him on this trial—
and sat in it for the purpose, as he states, of finding out exactly
the location of his child on the boat, so as to be able to get posses-
sion of it; and that the killing of Jones and Bidwell followed in
the manner shown in the record.    According to the testimony of
the appellant he had every opportunity to have killed both men
some time before he did—Bidwell especially, who had been
down to a little garden out of sight of the houseboat, according
to appellant's testimony, just before the killing.    Appellant says
that, when Bidwell disappeared from view, he thought that was
his opportunity to capture his little boy and make off with him;
that he left his blind and made for the little child, but Bidwell
came right up on him while he was trying to do so; that he told
Bidwell that he wanted his child, and that Bidwell rushed to the
boat, being thirty feet away from it, and only forty feet from his
gun, which was in the boat on a rack in a room; that he knew
Bidwell was making for his gun, and shot simply to cripple him
and to keep him from getting his gun; that the shot did not pre-
vent Bidwell from jumping on the boat and making his way into
the room; that Jones, who had come up, went into this room and
got Bidwell's gun out and leveled it on appellant, and that appel-
lant then shot, just in time to save his own life; that Jones fell,
and the gun fell by him; that then Bidwell came out to where
the gun lay and stooped down to pick it up, and he (the appellant)
shot to prevent being himself killed.    The woman Sue Pruette's
testimony absolutely and flatly contradicts all this testimony,
and makes the case, as stated, one of cold-blooded assassination.
But her testimony is contradicted in several most vital points
by her own daughter, Mrs. Jones; by her own niece, Ida May
Raussin; and by the sheriff.    Sue Pruette actually testified that

appellant came on the boat, after killing both men, and went into the room, got Bidwell's gun, and laid it down where it was afterwards found, beside the two men, obviously meaning to create the impression that appellant was doing this to shield himself, since, according to her testimony, the gun had never been taken from the rack during the difficulty. It was plainly shown, by Mrs. Jones and one or two other witnesses, that Bidwell's gun was found by Jones' body, pointed directly at the blind where the appellant was. Again, Sue Pruette testified, throughout her examination in chief, without once disclosing the fact that this little boy was aboard the boat, and the admission of that fact was extorted from her on cross-examination. She further expressly and repeatedly testified that the little boy was not taken from her on the boat. Her own daughter and her own niece expressly contradict her on this point, stating that the appellant got the boy from her arms on the boat. These facts are alluded to for the purpose of showing that testimony evidently inflamed with hate, as this testimony was, and utterly and flatly contradicted in vital points by the witness' own daughter and niece and by the sheriff—which testimony, too, was evidently the basis for the verdict—needed to be broken down by appellant, if the facts could break it down, and that, consequently, his testimony that she could not see more than ten feet from her, and his motive as to why he was hid in the blind, ought both to have been permitted to go to the jury.

We also think the point is well taken that instructions Nos. 2 and 4 for the state, taken together, were erroneous. Those instructions are:

No. 2. "The court instructs the jury, for the state, that if you believe from the evidence in this case, beyond a reasonable doubt, that the defendant willfully, deliberately, and of his malice aforethought, shot and killed Bidwell at a time when he, the defendant, was not in real or apparent danger of losing his

own life or of suffering great bodily harm at the hands of Bidwell, he is guilty as charged, and the jury should so find."

No. 4.    "The court instructs the jury, for the state, that you have the power to find any one of the four following verdicts: (1) 'We, the jury, find the defendant guilty as charged.'    Upon a return of this verdict the court will impose the death penalty. (2) 'We, the jury, find the defendant guilty as charged, and fix his punishment at imprisonment in the penitentiary for life.' If you find this verdict, the court will so sentence the defendant. (3) 'We, the jury, find the defendant guilty of manslaughter.' (4) 'We, the jury, find the defendant not guilty.' "

The particular point made is that, taken together, the jury are charged that they should find a verdict in the form, if they believed appellant guilty of murder, "We, the jury, find the defendant guilty as charged," and that the judge would impose the death penalty; in other words, the right of the jury, if they found him guilty, to sentence him to imprisonment in the penitentiary for life was taken away from them by these instructions, which tell them, in effect, that if they believe him guilty of murder, the form of the verdict should be, "We, the jury, find him guilty as charged."    The effect of the instructions is this: In the fourth instruction the jury are told that they have the power to sentence the prisoner to the penitentiary for life; but in the second instruction they are told, nevertheless, that they ought not to imprison him in the penitentiary for life, but should find him guilty as charged, leaving the court to sentence him to death.    We might not reverse for this error alone; but we point out the fact that it is error, that it may be avoided in future trials.    If the jury believe one guilty of murder beyond a reasonable doubt, he should be so found; but the jury should be left to determine for themselves, without any hint or intimation from the court, what the punishment should be.    See, as shedding light upon this principle, *Spain* v. *State,* 59 Miss., 19.

We are also of the opinion that it was error to refuse the instruction asked for appellant, which is as follows:

"The court instructs, for the defendant, that, even though the jury may believe from the evidence that the defendant was not acting in his necessary self-defense at the time he fired the first shot at Bidwell, yet, if the evidence has left a reasonable doubt in their minds as to whether Bidwell was killed by this shot or by a later one, then they will acquit, unless they further believe from the evidence, beyond a reasonable doubt, that the shot which killed Bidwell was fired by the defendant at a time when he (the defendant) was not in real or apparent danger of death or great bodily harm at the hands of Bidwell."

The learned assistant attorney-general insists that the eighth instruction for the appellant sufficiently set forth the idea embraced in the refused instruction, but in this case he is mistaken. The refused instruction was correct and stressed a specific proposition, vital to appellant's cause. The idea of the court in refusing this instruction seems to have been that appellant was estopped to set up the plea of self-defense, because of the doctrine that, when one arms himself with a deadly weapon for the purpose of slaying his adversary, etc., he cannot plead self-defense; but on the testimony of the appellant—which the jury alone had the right to pass upon—he had armed himself, not to provoke a difficulty, but simply to defend himself if attacked. It was shown that there was an interval between the first shot, which certainly did not kill Bidwell, and the second shot, which, according to appellant's testimony, was fired when Bidwell was in the very act of reaching for the gun, which had just dropped from the hands of Jones. According to appellant's testimony, he made no effort to shoot Bidwell the second time until Bidwell was reaching for the gun to shoot him.

We cannot close this opinion without directing the reporter to publish in full the brief filed for the appellant in this cause,

as it is a model of sound logic, accurate legal learning, and genuine eloquence.

*Reversed and remanded.*